IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2013 Term

_____

No. 12-1023

_____

**FILED**

**January 24, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LARRY V. FAIRCLOTH REALTY, INC.,
a corporation, and
LARRY V. FAIRCLOTH,
Plaintiffs Below, Petitioners

v.

THE PUBLIC SERVICE COMMISSION OF WEST VIRGINIA,
BERKELEY COUNTY PUBLIC SERVICE SEWER DISTRICT,
a public corporation, and
BERKELEY COUNTY PUBLIC SERVICE DISTRICT, d/b/a
BERKELEY COUNTY PUBLIC SERVICE WATER DISTRICT
Defendants Below, Respondents

_____

Appeal from the Public Service Commission of West Virginia
PSC Case No. 09-0961-PSWD-GI

AFFIRMED

_____

Submitted: January 16, 2013
Filed: January 24, 2013

Laura V. Faircloth, Esq.
Martinsburg, West Virginia
Attorney for Petitioners

Richard E. Hitt, Esq.
Charleston, West Virginia
Attorney for Respondent
The Public Service Commission
of West Virginia

William F. Rohrbaugh, Esq.
Martinsburg, West Virginia
Attorney for Respondent
Berkeley County Public Service
Sewer District

Mark E. Kauffelt, Esq.
Kauffelt & Kauffelt
Charleston, West Virginia
Hoy G. Shingleton, Jr., Esq.
Martinsburg, West Virginia
Attorneys for Respondent
Berkeley County Public
Service Water District

The Opinion of the Court was delivered PER CURIAM.

SYLLABUS

"Judicial estoppel bars a party from re-litigating an issue when: (1) the party assumed a position on the issue that is clearly inconsistent with a position taken in a previous case, or with a position taken earlier in the same case; (2) the positions were taken in proceedings involving the same adverse party; (3) the party taking the inconsistent positions received some benefit from his/her original position; and (4) the original position misled the adverse party so that allowing the estopped party to change his/her position would injuriously affect the adverse party and the integrity of the judicial process." Syllabus Point 2, *West Virginia Dept. of Transp., Div. of Highways v. Robertson*, 217 W.Va. 497, 618 S.E.2d 506, (2005).

Per Curiam:

This is an appeal by Petitioners Larry V. Faircloth, individually, and Larry V. Faircloth Realty, Inc. ("Faircloth"), from a May 9, 2012, order of the Public Service Commission ("PSC"). In that order, the PSC ruled that the Respondents, Berkeley County Public Service Sewer District ("Sewer District") and Berkeley County Public Service Water District ("Water District"), no longer satisfied the criteria for charging capacity improvement fees that Faircloth had challenged. Due to this finding, Faircloth is no longer required to pay the previously implemented capacity improvement fees. After entry of this order, the Water and Sewer Districts filed petitions for reconsideration with the PSC. Faircloth filed two motions in opposition to these petitions for reconsideration. The PSC agreed with Faircloth and denied the petitions for reconsideration.

Faircloth obtained the relief it sought on the central issue before the PSC – the elimination of the capacity improvement fees. Thereafter, the PSC agreed with Faircloth and denied the Water and Sewer Districts' petitions for reconsideration. Nevertheless, Faircloth filed the present appeal of the PSC's May 9, 2012, order.[1]

---

[1]Faircloth argues that the PSC erred by: (1) concluding that it had the jurisdiction and authority to establish a capacity improvement fee; (2) concluding that a capacity improvement fee constitutes a charge, rather than a tax; (3) failing to recognize that the Local Powers Act, *W.Va. Code* § 7-20-1, authorizes the imposition of "impact fees" only if the county in which the public service district is established has implemented a comprehensive
(continued...)

1

After considering all matters of record, we affirm the PSC's May 9, 2012, order.

## I. Factual and Procedural Background

In 2004, the Berkeley County Water District and Sewer District filed requests with the PSC to charge capacity improvement fees ("CIFs") due to rapid population growth in Berkeley County that was projected to overload the capacity of existing water and sewer plants. The CIF was a one-time fee charged to developers[2] in Berkeley County. The PSC states that a CIF charge represents the future cost to a utility of developing capacity to meet growth in customer demand. A CIF is meant to offset the cost a utility will be required to incur, and its existing customers must pay, to expand and construct the capacity to meet and serve the new demand in an area experiencing rapid growth.[3]

---

[1](...continued)
zoning ordinance; (4) failing to recognize that the Community Infrastructure Investment Project Act, *W.Va. Code* § 22-28-1, makes the assessment of a CIF unnecessary when a builder constructs its own improvements; and (5) even assuming that it had the statutory authority to establish a capacity improvement fee, the PSC arbitrarily and capriciously identified May 9, 2012, as the date that the Water and Sewer Districts ceased to meet the criteria necessary to support a capacity improvement fee.

[2]In its order approving the Water District's CIF, the PSC defined the term developers as "a person, corporation, or entity who is in the business of land and/or commercial or housing development, for profit, or a person, corporation, or entity who requests an alternate main line extension that includes the installation of mains by the person, corporation or entity."

[3]The PSC described the need for CIFs as follows:

(continued...)

2

Following public hearings and argument, the PSC approved the requested Berkeley County CIFs. The PSC determined that the rapid population growth could create a crisis and that "absent additional treatment capacity, capacity at the four existing sewer treatment facilities would be exhausted in five years." In its order approving the Sewer District's CIF, the PSC stated:

> The CIF will facilitate responsible infrastructure planning and sewage capacity increases. Responsible planning and financing of additional sewage treatment capacity is appropriate for an area experiencing the explosive growth that Berkeley County has, and expects to continue to experience. We find, therefore, that approval of the CIF . . . is consistent with our obligations pursuant to *W.Va. Code* § 24-1-1, in that the CIF is fair, encourages the well-planned development of utility resources, is just, reasonable, and will be applied without unjust discrimination or preference. The formula by which the CIF fees were calculated, based on a Georgia Tech model, is reasonable and appropriate, and we conclude that the CIFs are based primarily on the costs to maintain necessary capacity in order to serve new customers.

---

[3](...continued)
> CIFs were developed for a specific purpose: rapid population growth in portions of West Virginia was projected to overload the capacity of existing water and sewer plants long before originally expected and long before those plants reached the end of their operational useful lives. CIFs provided a temporary means of accumulating at least part of the funds necessary to expand capacity, thus reducing the rate impact on all customers.

3

Faircloth filed a complaint against the Sewer and Water Districts on February 27, 2009, requesting that the PSC rescind the CIFs[4] "until the economic, factual basis upon which they were created returns and further hearings are had to determine that any CIF sought by (the Districts) is reasonable, just and void of any sort of discrimination against developers and builders[.]" In response to Faircloth's complaint, the PSC initiated a general investigation into the CIFs charged by the Water and Sewer Districts. The PSC made Faircloth a party to this general investigation, explaining that:

> (Faircloth) raised questions that help define the scope of the review of the CIFs. (Faircloth), however, is at a disadvantage when it comes to investigating and presenting evidence regarding the need for the CIFs, the proper amount of the CIFs, and the allowable uses of the CIFs. The interconnected skills and disciplines required of this type of investigation – economics, projecting population and utility usage growth, projecting costs of utility plant construction, and law – would tax the resources of any individual complainant.

The PSC proceeded with this general investigation, held evidentiary hearings in which Faircloth and the Water and Sewer Districts participated, and established a briefing schedule for the parties. In October 2009, one week before the initial round of briefs from the Water and Sewer Districts were due before the PSC, Faircloth filed a declaratory

---

[4]The PSC approved a $1,623.00 water CIF in August 2005. This amount was increased to $3,120.00 in August 2007. Similarly, the PSC approved a $1,581 sewer CIF in March 2005. This amount was increased to $3,650.00 in October 2006. The PSC placed a number of controls on these CIFs, requiring that the CIF funds be placed in separate accounts and that the funds be used only for upgrades or construction of water or sewer treatment facilities.

4

judgment action in the Circuit Court of Berkeley County, seeking the same remedy it sought from the PSC: relief from paying the CIFs.

On January 29, 2010, the circuit court entered a declaratory judgment order finding that its exercise of jurisdiction was proper and ruling in favor of Faircloth on the substantive issues. The circuit court found that the PSC lacked jurisdiction to establish the CIFs.[5] The Water and Sewer Districts appealed the circuit court's ruling to this Court.[6] On February 24, 2011, this Court issued a memorandum decision finding that Faircloth had failed to exhaust its administrative remedies before the PSC. This Court determined that the circuit court did not have jurisdiction in the matter and reversed the circuit court's declaratory judgment order.

Upon being returned to the PSC, Faircloth sought an expedited ruling from the PSC and a temporary injunction to enjoin the imposition and collection of CIFs until a final decision was made.[7] After the PSC denied Faircloth's motion for a temporary injunction,

---

[5]The circuit court granted a stay of its declaratory judgment order pending appeal and ordered the PSC to deposit all CIFs collected during the stay into a separate escrow account.

[6]This Court permitted the PSC to intervene in the appeal of the circuit court's order.

[7]Faircloth filed a July 8, 2011, motion requesting an expedited ruling in this matter. On July 19, 2011, the PSC issued an order noting that the population growth data in the case was over 18 months old and directing the parties to provide the PSC with updated population growth information. After the parties filed motions with these updated population growth statistics, the PSC issued an order on September 30, 2011, which noted that the parties did not agree on population and customer growth data. The PSC therefore set the matter for an evidentiary hearing and required the parties to submit direct and rebuttal testimony on this issue.

Faircloth sought a writ of mandamus from this Court to compel the PSC to enter a final order in its general investigation and to stay the collection of CIFs until the PSC entered its final order. By order entered on November 10, 2011, this Court refused Faircloth's requested writ of mandamus and refused the request for a stay.

In December 2011, the PSC heard testimony regarding the continuing need for CIFs. After hearing this testimony and considering briefs filed by both Faircloth and the Water and Sewer Districts, the PSC issued a May 9, 2012, final order ("May final order") discontinuing the CIFs. The PSC's order explained that:

> CIFs are intended to address only rapid and unexpected capacity depletion that can be traced to extreme growth levels from new customers. Absent the compelling circumstances of (i) rapid and continued population growth, and (ii) a near-term exhaustion of system-wide capacity, CIFs are not warranted. To that end the Commission (PSC) created criteria to determine whether it was appropriate to charge a CIF. The recent economic downturn has slowed growth, and the Districts are no longer in immediate danger of exhausting the capacity of their respective treatment plants. Because the Districts no longer meet the criteria that were set by the Commission (PSC) and accepted by the District, it is appropriate to discontinue those fees.[8]

[8]The PSC determined that it had the statutory authority and jurisdiction to establish CIFs when extraordinary population growth (2% per year or 20% over ten years) had occurred and when identifiable exhaustion of existing water supply or sewage treatment capacity was demonstrated. The PSC determined that the Water and Sewer Districts could not satisfy this criteria because they failed to show that their existing capacity would be depleted within seven years or less.

We note that the PSC possesses broad statutory authority. The PSC's considerable powers concerning the regulation and control of public utilities can be found in *W.Va. Code* § 24-1-1(a) [1989], which states, in relevant part:

(continued...)

6

After the PSC issued this order discontinuing the CIFs, the Water and Sewer

Districts filed petitions for reconsideration with the PSC. Faircloth filed two motions in

[8](...continued)

> (a) It is the purpose and policy of the Legislature in enacting this chapter to confer upon the public service commission of this state the authority and duty to enforce and regulate the practices, services and rate of public utilities in order to:
>
> (1) Ensure fair and prompt regulation of public utilities in the interest of the using and consuming public; [and] . . .
>
> (4) Ensure that rates and charges for utility services are just, reasonable, applied without unjust discrimination or preference[.]

Similarly, *W.Va. Code* § 24-1-1(b) provides, in relevant part:

> (b) The public service commission is charged with the responsibility for appraising and balancing the interests of current and future utility service customers, the general interests of the state's economy and the interests of the utilities subject to its jurisdiction in its deliberations and decisions.

The Legislature has repeatedly stated that the PSC has the power to regulate utility rates, charges, and tariffs. For instance, *W.Va. Code* § 24-2-2(a) [1998] states that the PSC "may change any intrastate rate, charge or toll which is unjust or unreasonable[.]" Likewise *W.Va. Code* § 24-2-3 [1983] states, in relevant part, that the PSC:

> [S]hall have power to enforce, originate, establish, change and promulgate tariffs, rates, joint rates, tolls and schedules for all public utilities. . . . And whenever the commission shall, after hearing, find any existing rates, tolls, tariffs, joint rates or schedules unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of any of the provisions of this chapter, the commission shall by an order fix reasonable, rates, joint rates, tariffs, tolls or schedules to be followed in the future[.]

opposition to these petitions for reconsideration, asking the PSC to deny the petitions to reconsider the May final order. The PSC agreed with Faircloth and denied the Water and Sewer Districts' petitions for reconsideration on August 7, 2012 ("reconsideration order"). This order directed the Water and Sewer Districts to return any CIFs collected subsequent to the entry of the May final order.

On September 6, 2012, Faircloth appealed the PSC's May final order to this Court.

## II. Standard of Review

This Court has previously addressed the standard of review of an order entered by the PSC. In Syllabus Point 2 of *Monongahela Power Co. v. Public Serv. Comm'n of West Virginia*, 166 W.Va. 423, 276 S.E.2d 179 (1981), this Court stated:

> In reviewing a Public Service Commission order, we will first determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. We will examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Finally, we will determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.

8

This Court summarized the above formula in Syllabus Point 1 of *Central West Virginia Refuse, Inc. v. Public Serv. Comm'n of West Virginia*, 190 W.Va. 416, 438 S.E.2d 596 (1993), explaining,

> The detailed standard for our review of an order of the Public Service Commission . . . may be summarized as follows: (1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order is proper.

This Court has also stated that

> [A]n order of the public service commission based upon its findings of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles.

Syllabus Point 5, in part, *Boggs v. Public Serv. Comm'n*, 154 W.Va. 146, 174 S.E.2d 331 (1970) (internal citation omitted).

## III. Analysis

Faircloth has asserted inconsistent positions regarding the PSC's May final order – first requesting that the PSC deny the petitions for reconsideration and enforce that order, then appealing the order to this Court asking that it be reversed. Our law is clear that Faircloth is judicially estopped from challenging the May final order.

This Court addressed judicial estoppel in Syllabus Point 2 of *West Virginia Dept. of Transp., Div. of Highways v. Robertson*, 217 W.Va. 497, 618 S.E.2d 506 (2005), stating:

> Judicial estoppel bars a party from re-litigating an issue when: (1) the party assumed a position on the issue that is clearly inconsistent with a position taken in a previous case, or with a position taken earlier in the same case; (2) the positions were taken in proceedings involving the same adverse party; (3) the party taking the inconsistent positions received some benefit from his/her original position; and (4) the original position misled the adverse party so that allowing the estopped party to change his/her position would injuriously affect the adverse party and the integrity of the judicial process.

We have invoked judicial estoppel, *sua sponte*, based on our consideration of three factors. First, it is generally recognized that "a court, even an appellate court, may raise [judicial] estoppel on its own motion in an appropriate case." *Matter of Cassidey*, 892 F.2d 637, 641 (7th Cir. 1990). *See also* Franklin D. Cleckley, Robin J. Davis & Louis J. Palmer, *Litigation Handbook on West Virginia Rules of Civil Procedure* § 8(c) (Supp. 2012) ("[J]udicial estoppel is an equitable doctrine invoked by a court at its discretion."). Second, where inconsistent conduct is taken that "is barred by . . . judicial estoppel, there are no triable issues of fact as a matter of law." *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 39, 591 S.E.2d 870, 895 (2004). Third, the record presented in this appeal is sufficient for this Court to determine the application of the doctrine.

The doctrine of judicial estoppel is important in maintaining the integrity of our judicial system. We noted in *West Virginia Dept. of Transp., Div. of Highways v. Robertson*, 217 W.Va. at 504, 618 S.E.2d at 513, that:

> The doctrine of "[j]udicial estoppel is a common law principle which precludes a party from asserting a position in a legal proceeding inconsistent with a position taken by that party in the same or a prior litigation." *In re C.Z.B.*, 151 S.W.3d 627, 633 (Tex.Ct.App. 2004). Under the doctrine, a party is "generally prevent[ed] ... from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227 n. 8 (2000). This Court recognized long ago that "[t]here are limits beyond which a party may not shift his position in the course of litigation[.]" *Watkins v. Norfolk & Western Ry. Co.*, 125 W.Va. 159, 163, 23 S.E.2d 621, 623 (1942). Thus, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Hubbard v. State Farm Indem. Co.*, 213 W.Va. 542, 552 n. 21, 584 S.E.2d 176, 186 n. 21 (2003).

(Internal citations omitted).

Applying the four *Robertson* factors to the present case, we find that the first factor is met because Faircloth requested that the PSC deny the Water and Sewer Districts' petitions for reconsideration, and thus affirm its May final order. After the PSC granted the relief Faircloth requested, Faircloth filed the present appeal, requesting that the May final order be reversed. These two positions are plainly inconsistent. Faircloth's motions in opposition to the petitions for reconsideration did not contain any of the arguments raised in

11

this appeal. Nor did Faircloth file its own petition for reconsideration asking the PSC to affirm the portion of the order it agreed with, and to reverse the portion of the May final order that it subsequently challenged in this appeal. Instead, Faircloth adamantly argued that the petitions for reconsideration be denied and urged the PSC to enforce its May final order without any reservation.[9]

The second and third *Robertson* factors are also met. The second factor is met because Faircloth's inconsistent positions were taken in proceedings involving the same parties. The third factor is met because Faircloth received a benefit by prevailing in its motion to deny the petitions for reconsideration: it was no longer required to pay the CIFs that it had challenged. Additionally, the PSC ordered the Water and Sewer Districts to refund any CIFs they had collected since the May final order was entered.

---

[9]In its motions opposing the petitions for reconsideration, Faircloth argued that the May final order divested the PSC of jurisdiction over the case and argued that it did not have the authority to consider the petitions for reconsideration. In making this argument, Faircloth observed that the May final order held that "on entry of this Order this case shall be removed from the Commission docket of open cases."

Faircloth also argued that *W.Va. Code* § 24-5-1 "provides the sole method of review of a final order of the Commission (PSC)." *W.Va. Code* § 24-5-1 states, in relevant part, that "[a]ny party feeling aggrieved by the entry of a final order by the commission, affecting him or it, may present a petition in writing to the supreme court of appeals, or to a judge thereof in vacation, within thirty days after the entry of such order, praying for the suspension of such final order." Thus under Faircloth's reasoning before the PSC, a party's only remedy following a final order of the PSC is to file an appeal with this Court within thirty days. Faircloth chose not to appeal any of the relief granted in the May final order to this Court within thirty days. Instead, Faircloth forcefully argued that the case was over and that the May final order should be enforced.

12

Finally, we find that allowing Faircloth to maintain inconsistent positions on the May final order would affect the integrity of the judicial process. Faircloth obtained the relief it sought on the central issue before the PSC. It successfully opposed the petitions for reconsideration filed by the adverse parties. Faircloth then requested that this Court reverse the PSC's May final order so that it could obtain additional relief. To permit Faircloth to take inconsistent positions in this case "impedes rather than promotes, the truth-seeking function of the judiciary and thereby hinders public confidence in the integrity of the judicial process." *Robertson*, 217 W.Va. at 507, 618 S.E.2d at 516 (internal citation omitted). *See also Helfand v. Gerson*, 105 F.3d 530, 535 (9th Cir. 1997) ("The integrity of the judicial process is threatened when a litigant is permitted to gain an advantage by the manipulative assertion of inconsistent positions, factual or legal.").

Having applied the facts of this case to the elements of our judicial estoppel test, we conclude that Faircloth is judicially estopped from challenging the errors it alleges are contained in the PSC's May final order.

## IV. Conclusion

The PSC's May 9, 2012, order is affirmed.

Affirmed.

13